**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| L.G. an individual, | )  Case No.: 2:22-cv-01924 |
| | ) |
|    Plaintiff, | )  **JUDGE** _____ |
|   vs. | )  Related Cases: No. 19-cv-849 |
| | )       No. 19-cv-5384 |
| RED ROOF INNS, INC. AND RED ROOF | )       No. 21-cv-4933 |
| FRANCHISING, LLC, | )       No. 21-cv-4934 |
| | )       No. 21-cv-4935 |
|    Defendant(s). | ) |
| | )  **DEMAND FOR JURY TRIAL** |
| | ) |

## COMPLAINT

COMES NOW the Plaintiff L.G. ("Plaintiff" or "L.G."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Criminals have paraded their misconduct openly on hotel properties throughout the country while the hotels and hospitality giants pay lip service to campaigns against sex trafficking, while collecting profits from the criminal misconduct at the expense of human life, human rights, and human dignity.

2. Defendants RED ROOF INNS, INC and RED ROOF FRANCHISING, LLC (collectively, "Red Roof"), know and have known for more than a decade that sex trafficking repeatedly occurs under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Red Roof has instead chosen to ignore and thereby facilitate commercial sex trafficking on their branded properties, enjoying the monetary profit and other

benefits stemming from rooms rented for the purpose of sex trafficking, while making no attempt to raise awareness or put an end to the repeated abuses of victims at their branded properties.

3.     This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials L.G., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.     L.G. was trafficked for commercial sex throughout Red Roof hotels in Maryland and Virginia. L.G. was sold via commercial sex transactions at the Red Roof's hotel properties, where force, fraud, and coercion were used against her, while Red Roof turned a blind eye and continued to benefit.

5.     L.G. was advertised for sex on various websites known for trafficking, whereby Red Roof provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of L.G. for the purpose of sex trafficking.

6.     Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for L.G. to be sold repeatedly to buyers who frequented Red Roof's hotel properties to purchase victims of sex trafficking, including L.G.

7.     With knowledge of the problem, and as a direct and proximate result of Red Roof's multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel properties, L.G. was sex trafficked, sexually exploited, and victimized repeatedly at Red Roof's hotels.

8.     The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against Red Roof who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate a venture which enabled, harbored, held, facilitated, or any

combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of L.G. for their own benefit.

9.     The Plaintiff brings this action for damages against Red Roof listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in sex trafficking in violation of the TVPRA.  Red Roof turned a blind eye to more than a decade of direct knowledge regarding anti-trafficking efforts and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## PARTIES

10.     Plaintiff L.G. is a natural person who resides in Howard County, Maryland.

    a.     Plaintiff L.G. was living in Washington, D.C. and was sixteen (16) years old when she was fraudulently induced, coerced, and assaulted before being sold for the purposes of commercial sex throughout Anne Arundel and Prince George's Counties in Maryland and the Independent City of Alexandria in Virginia.  The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (16).

    b.     Due to the sensitive, private, and potentially retaliatory nature of the allegations, Plaintiff L.G. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter. [1]

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure. of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

d.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape and commercial sex trafficking. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e.  In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy and safety interests substantially outweigh the customary practice of judicial openness.[5]

f.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish

---

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Stegall,* 653 F.2d at 186 (5th Cir. 1981); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Supra* n. 1 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

> Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

11.     Defendant RED ROOF INNS, INC. is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through Defendant RED ROOF FRANCHISING, LLC.[6] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

   a.     Red Roof is a large hotel brand with over 550 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054 and can be served through its registered agent, Corporation Service Company at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

   b.     Red Roof Franchising, LLC was name one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054 and can be served through its registered agent, Corporation Service Company at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

   c.     The claims in the lawsuit arise, in part, from Red Roof's conspiracy with other defendants related to business and contracts that took place in Ohio as well as other states.

   d.     Red Roof owns, supervises, and/or operates the Red Roof Inn PLUS+®

---

[6] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

Baltimore-Washington DC/BWI Airport located at 827 Elkridge Landing Road, Linthicum Heights, Maryland 21090.

e.    Red Roof owns, supervises, and/or operates the Red Roof Inn PLUS+® Washington, DC-Oxon Hill located at 6170 Oxon Hill Road, Oxon Hill, Maryland 20745.

f.    Red Roof owns, supervises, and/or operates the Red Roof Inn PLUS+® Washington, DC-Alexandria located at 5975 Richmond Highway, Alexandria, Virginia 22303.

12.    Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

## JURISDICTION AND VENUE

13.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000).

14.    The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act.

15.    Pursuant to Southern District of Ohio Local Rule 3.1(b) this case is related to Case No. 2:19-cv-849, Case No. 2:19-cv-5384, Case No. 2:21-cv-4933, Case No. 2:21-cv-4934, and Case No. 2:21-cv-4935 currently pending before Chief Judge Algenon L. Marbley.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants RED ROOF INNS, INC. and RED ROOF FRANCHISING, LLC have their principal place of business within this District.

## SEX TRAFFICKING UNDER FEDERAL LAW

17.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

18.     The vast majority of commercial sex trafficking transactions occur within the hospitality industry.[7]

19.     The TVPRA prohibits Red Roof from engaging in any venture they know or should know involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in what they know or should know involves a trafficking venture.

20.     Indeed, human trafficking in hotels is a top-down problem in the hospitality industry, hotel parent companies like Red Roof have a duty and responsibility, to set policies and procedures to combat human trafficking and comply with the TVPRA. Instead, Defendants hired media professionals making public claims to investors and customers to "address" the longstanding problem of human trafficking at hotels rather than engaging experts in human

---

[7] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, Huffington Post, July 22, 2015, *available at* https://www.huffpost.com/entry/combating-human- trafficking-in-the-hotel-industry_b_7840754 (last visited October 14, 2019).

trafficking and security to train hotel staff and implement mandatory and effective anti-human trafficking policies and protocols.

21.     Red Roof has utterly failed to take the actions needed to combat the known scourge of human trafficking. As part of their efforts to save costs and continually reap millions of dollars in profits, Red Roof failed to develop mandatory and comprehensive training to prevent human trafficking, failed to implement training to prevent human trafficking, and failed to conduct audits confirming that training had been implemented and that human trafficking occurrences were being prevented on hotel properties. Red Roof further failed to enact robust policies and practices to ensure continuous, directed action to combat human trafficking on their properties.

22.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

23.     Plaintiff's injuries are indivisible.

24.     The TVPRA provides for joint and several liability.

### THE SEX TRAFFICKING OF L.G. AT DEFENDANT HOTELS

25.     L.G. first met her trafficker in approximately 2009, when she was 16 years old.

26.     In the summer of 2009, L.G.'s trafficker showed interest in her and asked her out to lunch.  At the time, L.G. was in a youth shelter and had a curfew.  What started out as a lunch date turned into years of sexual exploitation and abuse. L.G.'s trafficker kidnapped her and brought her to his home. L.G's trafficker kept her captive, preventing L.G. from returning the shelter.

27.     In this vulnerable position, L.G.'s trafficker took advantage of her and manipulated her, telling her that she would need to pay for their living arrangements. By means of a combination of violence, threats, and induced dependence on illegal substances, L.G was held captive and sold for sex by her trafficker approximately from the summer of 2009 through October 2012.

8

28.     For a brief period of time, L.G. came into contact with another trafficker through a messaging app. Both of L.G.'s trafficker consistently trafficked her in hotels throughout Virginia, Maryland and the District of Columbia.

29.     During the time that she was trafficked, L.G.'s traffickers frequently rented rooms at the Red Roof's branded hotel locations because such rooms provided convenient, anonymous, and relatively central locations to which they could invite "johns" for the purpose of forcing L.G. to perform commercial sex acts with those "johns" for money.

30.     Throughout her trafficking, LG.'s traffickers connected with "johns" willing to abuse L.G. for money by posting or causing to be posted entries on websites, like Backpage, advertising commercial sexual activity with L.G.

31.     These postings on online platforms known for human trafficking accomplished their goal to the point that L.G. was often sold to and forced to perform sexual acts with multiple "johns" in a single night.

32.     Over the course of a grueling three years while under the coercive control of traffickers and johns, L.G.'s traffickers and her customers rented rooms at, and forced her to have sex for money within, at least the following hotels:

   a. Red Roof Plus+ Baltimore-Washington DC/BWI Airport located at 827 Elkridge Landing Road, Linthicum Heights, Maryland 21090, staying on five separate occasions for 3 days at a time between approximately Summer 2012 to June 2012;

   b. Red Roof Plus+ Washington DC-Oxon Hill located at 6170 Oxon Hill Road, Oxon Hill, Maryland 20745, staying an estimated 60 times for 2 to 7 days at a time from approximately the Summer 2009 to June 2012.

    c.   Red Roof Plus+ Washington DC-Alexandria located at 5975 Richmond Highway Alexandria, VA 22303 staying an estimated 40 nights for one day to a week at a time between approximately Summer 2009 to June 2012.

33.    During the time she was trafficked, L.G.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals, including the hotels above.

34.    While at Red Roof's branded hotels, L.G.'s traffickers threatened and administered physical violence to ensure that she could not escape.

35.    During her many stays in Red Roof's branded hotels, including at the locations just listed, L.G. was subjected to rape, frequent physical and verbal abuse, malnourishment, psychological torment, kidnapping, and false imprisonment all the while hotel employees and managers allowed her trafficking.

36.    At Red Roof's branded hotels, L.G. encountered the same staff on multiple occasions. Such staff would have seen the signs of L.G.'s deterioration brought on by the abuse perpetrated by "buyers" and her traffickers, including visible bruising and physical and verbal abuse occurring in public areas of Red Roof's branded hotels.

37.    L.G.'s traffickers followed a repetitive and routine procedure during stays at Red Roof's branded hotels, which resulted in several consistent red flags, that were readily noticeable to employees, including:

    a.   Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    b.   L.G.'s physical appearance being malnourished, bruised, beaten, drugged, and inappropriate attire;

    c.      Multiple young girls in inappropriate attire for the weather, all in one room with a continuous procession of adult men entering and leaving the room;

    d.      The trafficking victims were made to walk the streets by the hotels in 5-inch heels and leggings, and would bring buyers back to the hotels;

    e.      Excessive requests for sheets, cleaning supplies, towels, and room service;

    f.      Trash cans full of used condoms and condom wrappers;

    g.      The personal relationship between various hotel staff and L.G.'s trafficker;

    h.      Multiple fights, loud noises, and arguments that could be heard from inside of L.G.'s rooms; and

    i.      The direct employee encounters with L.G. and her trafficker inside the Red Roof Plus+ Washington, DC - Oxon Hill.

38.     The staff at the Red Roof Plus+ Washington, DC – Oxen Hill were put on notice of L.G.'s trafficking on several occasions.

    a.      During one instance, the hotel staff interacted directly with L.G.'s trafficker. The staff told L.G.'s trafficker to keep his girls, including L.G. and other children he was trafficking, off the property because they were dressed inappropriately and would "draw attention" to the hotel. Despite this, the trafficking of L.G. continued at this location.

    b.      On another occasion, L.G.'s trafficker physically assaulted her in the room, and L.G. ran out of the room screaming and crying through the hallway. The hotel staff and other guests would have heard her screams.

    c.      In March 2012, the police responded when L.G.'s trafficker attempted to recruit the locations housekeeper to coerce her into commercial sex acts with buyers. When the police arrived, they discovered L.G.'s trafficker with

L.G. and two children under the age of 16. However, the police only searched the room and arrested the group for possession of a firearm and did nothing to stop the trafficking. The hotel staff was aware of this incident, and interacted with law enforcement, yet L.G.'s trafficker returned to the hotel and continued to traffic L.G.

39.     Despite this abundance of available evidence of L.G.'s captivity and abuse, L.G. received no assistance from any employee of Red Roof, and Red Roof continued to repeatedly rent rooms to her trafficker and any "buyers".

40.     The impact of being beaten, threatened, exploited, raped, sex trafficked, and ignored at Red Roof's branded hotel properties has forever emotionally and physically injured L.G. who, despite the years since her escape, suffers immensely as a result of the horrors inflicted upon her at Red Roof's branded hotels.

41.     Had Red Roof not hewed to a common policy of harboring known and suspected human traffickers in exchange for financial benefit, L.G.'s traffickers likely could not have successfully arranged the commercial sex transactions that were the reason underlying L.G.'s continued captivity.

42.     Had Red Roof not hewed to a common policy of actively ignoring signs of ongoing human trafficking, the open and obvious signs of L.G.'s sex trafficking would likely have resulted in a far earlier reporting of her traffickers and thus in a far earlier end to her victimization.

43.     L.G.'s injuries are thus the direct and proximate result of Red Roof's maintenance of policies and procedures that they knew or should have known incentivized their employees to ignore the obvious signs of human trafficking, and even rent rooms to known or suspected human traffickers, while they continued to profit from sex trafficking.

44. This action follows.

## THE HOSPITALITY INDUSTRY'S PARTICIPATION
## IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project*[8]

45. Human trafficking is the world's fastest growing crime.[9] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[10]

46. Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

47. The hospitality industry plays a crucial role in the sex trade.[11] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

48. According to National Human Trafficking Hotline statistics, hotels are the top-

---

[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[9] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[10] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

reported venue, even over commercial front brothels, where sex trafficking acts occur.[12] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

49.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an "in call."

50.     Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room, and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

51.     The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[13]

52.     Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[14] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

53.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has a duty to train and equip staff on

---

[12] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

how to identify, report, and prevent sexual exploitation where it is most likely to occur. [15]

54.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[16]

55.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[17]

56.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Proper training and implementation of reasonable security and cybersecurity measures are the bare minimum necessary for hospitality companies to address regular sex trafficking occurring under their flag.

57.     There are many signs of sex trafficking. While some red flags are obvious, others are recognizable with properly trained employees.  These signs include: an excess of condoms in

---

[15] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015),
https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).
[16] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017),
http://scholarship.sha.cornell.edu/honorstheses/3.
[17] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at:
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting two (2) rooms next door to each other; declining room service for several consecutive days; significant foot traffic in and out of room(s); men traveling with multiple women who appear unrelated or significantly younger; women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[18]

58.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus, hospitality companies have acknowledged their obligation to adopt policies and procedures related to sex trafficking but have failed to enforce these policies and procedures as brand standard through to the property level. Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[20]

59.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years. Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[21] Put another way, the numbers showed that a

---

[18] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[19] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[20] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[21] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.

sex trafficker's annual profit per victim was approximately $22,000.00.[22]

60.    At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[23] In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[24]

61.    The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

62.    ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including: not renting by the hour, not permitting cash payments, blocking "Internet access to popular websites for online sex ads," and monitoring "online sex ads such as Craigslist

---

[22] *Id.* at 15.

[23] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.

[24] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/15063917617 47/NoVacany_Report.pdf.

and Backpage for your hotel name and pictures of your rooms and guests."[25] As a signatory to the ECPAT-USA code, hotel members also receive access to extensive and detailed resources for training and best practices to prevent human trafficking.

63.     In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[26]

64.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community because it tears at our social fabric. It ought to concern every business because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[27]

65.     In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[28]

66.     The United States Department of Justice ("DOJ") brought 248 sex trafficking

---

[25] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/15573426968 92/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.
[26] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[27] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.
[28] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.

prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[29] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[30]

67.     Sex trafficking is a lucrative industry. For instance, pimps in the Atlanta, Georgia area could earn an estimated $25,000.00 to $33,000.00 per week selling in 2015.[31] Just as trafficking is highly profitable for sex traffickers, it is profitable for corporations who generate revenue indirectly from the exploitation of victims. For instance, starting in 2010, Backpage.com ("Backpage") became the leader in the advertisement of "adult services," generating annual revenue of approximately $150,000,000.00 and approximately $3,100,000.00 from sex ads in just one week.[32]

68.     Between January 2013 and March 2015, ninety-nine percent (99%) of global income related to or arising from Backpage was derived from the website's "adult section," including advertisements sexually exploiting children, and Backpage has been called the "World's Top Online Brothel."[33] A study estimated that one commercial sex advertisement on the Backpage website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[34]

69.     The U.S. Senate Permanent Subcommittee on Investigations issued a staff report in

---

[29] *Id*. at 389.
[30] Human Rights First, *Fact Sheet 2017* (2017), *available at*
http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[31] Sarkisian, *supra* n.13, at 4.
[32] *See e.g.* http://www.chicagotribune.com/business/ct-backpage-raided-ceo-carl-ferrer-arrested-20161006-story.html; https://www.nytimes.com/2016/10/07/us/carl-ferrer-backpage-ceo-is-arrested.html?_r=0; and https://www.washingtonpost.com/news/morning-mix/wp/2016/10/07/ceo-of-backpage-called-worlds-top-online-brothel-arrested-on-pimping-charges/?utm_term=.bbcf8b9dcb10.
[33] *Id.*
[34] Sarkisian, *supra* n.13, at 5.

January 2017 (hereinafter "Senate Report") entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" that summarizes the role Backpage has played in the burgeoning criminal industry of sex trafficking.[35] The report estimated that Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public (excluding reports by Backpage itself).[36]

70.     One of the principle findings of the Senate Report is that Backpage knows that it facilitates prostitution and child sex trafficking: "Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them…[and] the company has often refused to act swiftly in response to complaints about particular underage users—preferring in some cases to interpret these complaints as the tactics of a competing escort."[37]

71.     Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. Hotel brands, and their corporate executives, make public statements acknowledging the epidemic, but stop short of taking action to address the problem. Yet, they continue to profit millions.

72.     The United Nations and the U.S. government recognize the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiatives as early as 1997 with the UN Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[38] These efforts sought to educate both the

---

[35] *See* http://www.portman.senate.gov/public/index.cfm/files/serve?File_id=5D0C71AE-A090-4F30-A5F5-7CFFC08AFD 48. Additionally, a copy of the full Senate Report plus its appendix can be accessed online at: https://www.hsgac.senate.gov/subcommittees/investigations/reports.
[36] *Id*.
[37] *See id*.
[38] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

public and private sectors on identifying and combatting human trafficking, including the hospitality industry. Both campaigns have online resources and toolkits, including materials specific to the hospitality industry, which are publicly accessible to any entity concerned with human trafficking.[39]

73.     The 2016 Trafficking in Persons Report issued by the U.S. Department of State confirms that human trafficking occurs in the hospitality industry in the United States.[40] A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation in New York reported that the sexual exploitation took place in a hotel.[41] Even estimates by attorneys *for* the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[42]

74.     The hotel industry is enabling instead of preventing the sexual exploitation of adults and children.[43] A recent survey of survivors who called the National Human Trafficking Hotline conducted by the nonprofit Polaris project found that sixty percent (60%) of those who responded had been forced to engage in commercial sex within the confines of a hotel or motel during their trafficking, and seventy-five percent (75%) had stayed in a hotel or motel during travel or otherwise directly encountered a hotel or motel at some point during their trafficking.[44] Ninety-two percent (92%) of the calls the Hotline received from hotels reported sex trafficking in 2014.[45] A 2015 study revealed that forty-five percent (45%) of those who were trafficked as children

---

[39] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).
[40] U.S. Dep't of State, *supra* n.37, at 387.
[41] Sarkisian, *supra* n.13.
[42] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation. Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[43] *See* http://www.ecpatusa.org/wp-content/uploads/2016/05/Regional-Report-North-America.pdf.
[44] *On-Ramps, Intersections, and Exit Routes,* POLARIS (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf.
[45] Sarkisian, *supra* n.13 at 3.

reported the sexual exploitation took place in a hotel.[46]

75.     The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex traffickers move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Indeed, hotel staff are often the only outside witnesses to the victims' abuse. But traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains because they know it is unlikely that they will be disturbed.

76.     Red Roof "combats" the problem of human trafficking with public relations campaigns rather than taking concrete steps to identify trafficking on their properties and protect victims. To curry more favor with the public, Red Roof together, most often through state and national associations like the American Hotel & Lodging Association ("AHLA")[47]—where several hotel brands are members[48]—advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking, yet do nothing to stop the problem.[49]

77.     Some hotel brands promote employee human trafficking awareness training yet fail to mandate it across their properties. Hotel brands such as Red Roof post press releases about joining ECPAT yet fail to adopt the recommended policies. Red Roof displays human rights

---

[46] *Id.*

[47] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. See American Hotel & Lodging Association, Who We Are, available at https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[48] *See* American Hotel & Lodging Association, Our Members, *available at* https://www.ahla.com/our-members.

[49] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking." http:/www.ahla.com/uploadedFiles/_Common/pdf/Trafficking_Principles_Industry_Update.pdf) (note that AHLA's Industry Principles article has since been removed from its website).

statements on their websites yet fail to address one of the most egregious human rights violations on their properties. Red Roof publicly states they value the safety of their guests yet fail to adopt mandatory security protocols to protect children and adults trafficked on their properties. Red Roof has ample access to countless resources from the U.S. Government, ECPAT, and Polaris yet fails to take advantage of them. Red Roof and their executives, upon information and belief, receives and reviews reports from the Polaris Project and law enforcement about instances of trafficking within their operations yet fail to take measures to stop them from happening again.

78.     Red Roof has a legal obligation to combat the prevalence of human trafficking at their locations. Red Roof's employees are firsthand witnesses to the exploitation of human trafficking victims, meaning Red Roof and their properties can identify trafficking at a key stage to prevent it. Red Roof has publicly acknowledged the problem and have the power to mandate changes at their countless properties across the country. However, for decades, they have repeatedly failed to take tangible steps to protect victims. Instead, Red Roof continues to facilitate these crimes while profiting millions.

### THE DEFENDANTS CONTROL OVER THEIR HOTEL LOCATIONS

79.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third-party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

80.     The average consumer does not see this relationship. The parent brand gives the franchise property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect the standards consistent with the parent

hotel brand. The same brand name is emblazoned on everything in the hotel from the pens on the bedside tables to the staff uniforms at the front desk.

81.    In addition to brand recognition, the brand provides the franchise hotel with access to other resources including: marketing, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, its brand-wide central reservation system, a customer support number, revenue management tools, property management software, IT support, customer support, data on customer reviews, world-class loyalty programs, and a website.  Thus, booking, room reservations, and internet data collection are controlled by the corporate parent brand.[50]

82.    The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

83.    Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

84.    At the time of the incidents alleged herein, Defendant Red Roof owned and controlled the Red Roof Inn PLUS+® brand hotel.

85.    Parent hotel brands may remove delinquent hotels from their system, but it is at the expense of terminating their royalty payments.

86.    Red Roof magnifies their influence and control over the hospitality industry through their membership and activity in trade associations such as AHLA.

87.    Upon information and belief, Red Roof is a member of AHLA, and has served on

---

[50] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

executive committees or as board members in AHLA,[51] or other state and national associations since at least 2008.[52]

88.　　Upon information and belief, AHLA serves as a forum for Red Roof and other hotel brands to discuss efforts related to human trafficking and as a voice from which Red Roof can address the issue with the public.

89.　　Through national hotel industry trade associations, Red Roof disseminated very specific talking points to provide to the government, law enforcement, the public, and the media. These talking points amounted to nothing but spin whereby Red Roof totes themselves as heroes. These were more than advertising campaigns. They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from the brands and assure them that the hotel industry, and Red Roof specifically, were meaningfully addressing the industry-wide problem of human trafficking. By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking"[53] Red Roof assumed the responsibility of meaningfully addressing human trafficking at their branded properties.

90.　　Upon information and belief, between at least 2008 to 2016 Red Roof held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

91.　　Upon information and belief, between at least 2008 to 2016 Red Roof held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

92.　　Upon information and belief, during at least 2008 to 2016, emails were exchanged by employees of Red Roof's respective brands that related to sex trafficking in hotels, including Red Roof's hotels.

---

[51] *See* https://www.ahla.com/press-release/ahla-announces-2020-officers-board-executive-committee-amid-record-membership.
[52] *See* American Hotel & Lodging Association, Partner State Associations, *available at* https://www.ahla.com/psa.
[53] *See* https://www.ahla.com/issues/human-trafficking.

93.     As an industry leader, Red Roof failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Red Roof did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

94.     Red Roof collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. Red Roof did not call for stricter room rental requirements. For example, Red Roof did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Red Roof refused to communicate to traffickers "your business and your money are not welcome here."

95.     Through this coordinated effort, Red Roof was able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $99 billion in business a year and the fact that a large percent of all sex trafficking activities occurs at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from sex trafficking.

96.     Red Roof's coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that

put together a policy that eliminated trafficking from their branded properties.

### THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

97.     Red Roof has been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking at their hotels. Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[54]

98.     Red Roof owns, supervises, or operates the Red Roof Plus+ Baltimore-Washington DC/BWI Airport located at 827 Elkridge Landing Road, Linthicum Heights, Maryland 21090; the Red Roof Plus+ Washington DC-Oxon Hill located at 6170 Oxon Hill Road, Oxon Hill, Maryland 20745; and the Red Roof Plus+ Washington DC-Alexandria located at 5975 Richmond Highway Alexandria, VA 22303. Red Roof failed to implement and enforce any of its own policy or policies and protect Plaintiff L.G. from being sex trafficked.

99.     For years Red Roof has been on notice of repeated incidences of sex trafficking occurring on its Red Roof branded properties, yet Defendants have failed to take action to prevent sex trafficking at Red Roof brand properties. Red Roof's inattention in this regard enabled and contributed to the sex trafficking Plaintiff suffered at the Red Roof branded hotels.

100.    There are numerous examples of Red Roof's knowledge of sex trafficking on its branded properties and its continued failure to prevent and remedy the blight of human trafficking victims.

101.    Upon information and belief, Plaintiff alleges that Red Roof implemented means

---

[54] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

which gave it the ability to monitor various guest reviews indicating prostitution, trafficking, and guest safety issues at its branded hotels.

102.    Red Roof signed the ECPAT Code, but as evidenced by the widespread sex trafficking which continued to occur at Red Roof's branded properties, Red Roof did not practice what it preached.

103.    Despite Red Roof's anti-trafficking stance, Red Roof failed to implement and enforce any of its own policy or policies, including with respect to the Red Roof Inn® hotels. Red Roof knew or should have known that the Red Roof Inn® hotels were located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when L.G. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Red Roof failed to take adequate measures to prevent the misconduct.

104.    Red Roof voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnerships with ECPAT and Polaris, and its activities with the AHLA and other trade organizations. However, Red Roof failed to implement its own policies and those recommended to it by the above-mentioned advocacy organizations. This failure resulted in trafficking at its branded properties, including the trafficking of L.G.

105.    Red Roof Inns, Inc. knew or should have known that the Red Roof Inn PLUS+® hotels where Plaintiff L.G. was trafficked were located in areas known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff L.G. was trafficked.

106.    Despite having knowledge of the extensive prostitution and sex trafficking that

occurs at its hotels, Red Roof has repeatedly failed to stop these actions.

107. Red Roof Inns, Inc. through its subsidiary Red Roof Franchising, LLC was in an agency relationship with the Red Roof Inn PLUS+® branded hotels offering public lodging services in the hotel. This agency relationship was created through Red Roof's exercise of an ongoing and systemic right of control over the Red Roof Inn PLUS+® hotels by Red Roof's operations, including the means and methods of how Red Roof Inn PLUS+® branded hotels conducted daily business through one or more of the following actions:

a. providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brands;

b. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

c. providing new hire orientation on human rights and corporate responsibility;

d. providing training and education to Red Roof Inn PLUS+® branded hotels through webinars, seminars, conferences, and online portals;

e. providing and controlling customer review and response platforms;

f. hosting online bookings on Red Roof Inns, Inc.'s domain;

g. requiring Red Roof Inn PLUS+ branded hotels to use Defendant Red Roof Inns, Inc.'s customer rewards program;

h. requiring Red Roof Inn PLUS+® branded hotels to use Defendant Red Roof Inns, Inc.'s property management software;

i. requiring Red Roof Inn PLUS+® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    j.      providing IT support for all property management systems, owned, operated, and required by Red Roof Inns, Inc.;

    k.      setting employee wages;

    l.      making employment decisions;

    m.      advertising for employment;

    n.      sharing profits;

    o.      standardized training methods for employees;

    p.      building and maintaining the facility in a manner specified by the owner;

    q.      standardized or strict rules of operation;

    r.      regular inspection of the facility and operation by owner;

    s.      fixing prices; or

    t.      other actions that deprive Red Roof Inn PLUS+® branded hotels of independence in business operations.

108.    Upon information and belief, Red Roof tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Red Roof's management and control and included all of the indicia of L.G.'s trafficking. This data included the details of L.G.'s check-in, the internet activity associated with her reservation, including Backpage advertisements listing the hotel's address, her location at the hotel, and the spike in requests for towels and other items from inventory.

109.    An apparent agency also exists between Red Roof and Red Roof Inn PLUS+® branded hotels. Red Roof held out Red Roof Inn PLUS+® branded hotels to the public as possessing authority to act on its behalf.

110.     Given Red Roof's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Red Roof Inn PLUS+® branded hotels, Red Roof breached its duties in the following ways:

a.     did not adequately distribute information to assist employees in identifying human trafficking;

b.     failed to mandate a process for escalating human trafficking concerns within the organization;

c.     failed to mandate managers, employees, or owners attend training related to human trafficking;

d.     failed to provide new hire orientation on human rights and corporate responsibility;

e.     failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

f.     failed to develop and hold or require ongoing training sessions on human trafficking;

g.     failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

h.     failed to evaluate universal reservation systems for suspicious booking activities;

i.     failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

j.     failed to ban cash or prepaid credit cards as payment; and

      k.      failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

111.    Upon information and belief, Red Roof requires its branded hotel properties to use a property management system, which is linked to Red Roof's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

112.    Red Roof use a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[55]

113.    Red Roof require its hotels to use a consolidated IT system and database for property management, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[56]

114.    Upon information and belief, Red Roof requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that gives Red Roof the ability to access and harvest that internet data.[57]

115.    Upon information and belief, Red Roof retains and can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above. Upon information and belief, Red Roof's access included branded hotels' guest information registration, including names, date of booking, and length of stay.

---

[55] *See* Red Roof Privacy Notice, *available at* https://www.redroof.com/privacy-policy
[56] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology
[57] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

116.    Upon information and belief, Red Roof can therefore see unusual or suspicious bookings, for instances, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays were requested.

117.    Upon information and belief, Red Roof has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.[58] Upon information and belief, Red Roof can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.

118.    Upon information and belief, and contrary to ECPAT best practices, Red Roof failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

119.    Upon information and belief, Red Roof has the ability to see disproportionately male clientele registering for short hotel stays while accessing Backpage and other commercial sex advertisements and websites extended to the Red Roof Inn PLUS+ locations where Plaintiff was trafficked for sex.

120.    Despite having access to information comprising clear sex trafficking indicators, Red Roof continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought Plaintiff.

121.    Upon information and belief, Red Roof monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

122.    Upon information and belief, Red Roof provides a platform for brand property employees to report, at their discretion, to the Brand suspicious activity occurring at their branded

---

[58] *See*, *e.g.*, https://money.cnn.com/2016/07/15/news/companies/starbucks-mcdonalds-wifi-porn/index.html; https://endsexualexploitation.org/articles/filterpublicwifi_starbucks_library_congress/.

hotel. Red Roof, upon information and belief, controls and houses this collective data from all branded properties.

123. Thus, for several years, Red Roof knew or should have known of the rampant prevalence of sex trafficking which occurs on its Red Roof Inn® and Red Roof Inn PLUS+® branded properties throughout the country. Red Roof was aware of countless examples:

  a. In July 2011, two (2) women were arrested for prostitution and promoting prostitution at the Red Roof Inn in Lawrence Township, NJ.[59]

  b. In June 2012, a woman was arrested for prostitution at the Red Roof Inn in Arlington Heights, IL.[60]

  c. The Red Roof Inn in Brandon, Florida was a motel that is frequently involved in illegal activity, to include illegal narcotics, prostitution, and dealing in stolen property in November, 2018.[61]

  d. On January 2016, a night manager for the Red Roof Inn in Smyrna, Georgia confirmed not only that human trafficking was occurring at the property, but also that the corporate officers and franchisee owner were aware of the problem.[62]

  e. In March 2016, Two men were arrested for trafficking a 16 year old child at several hotels in the DC area, including the Red Roof Inn Rockville in December of 2015.[63]

  f. When a local newspaper questioned Red Roof Inn at BWI Airport, where L.G. was trafficked, about cases of sex trafficking on their property in 2013, the hotel

---

[59] *See* https://patch.com/new-jersey/lawrenceville/prostitution-suspects-arrested-at-red-roof-inn
[60] *See* https://www.arlingtoncardinal.com/2012/06/prostitution-arrest-red-roof-inn-on-algonquin-rd-arlington-heights/
[61] *See* https://www.abcactionnews.com/news/motel-frequently-involved-in-criminal-activity-sees-more-than-200-calls-for-service-this-year
[62] *See* https://atlantadailyworld.com/2016/01/22/124119/
[63] *See* https://www.thesentinel.com/communities/prince_george/news/crime/two-men-arrested-in-connection-with-human-trafficking-and-sexual-abuse/article_e155e22f-a265-5ddb-93ae-498f5f0761c8.html

refused to comment.[64]

g. In 2014, an officer with Anne Arundel Police officer stated that trafficking "flourishes" around the hotels at the BWI Hotel District, where the Red Roof Inn at BWI Airport was located.[65]

124. Red Roof is also aware of many negative reviews references common red flags of trafficking occurring at their hotel locations, and upon information and belief, received and analyzed these reviews.

125. Red Roof was aware of negative reviews of the Red Roof PLUS+ Baltimore-Washington, including:

a. A December 2016 TripAdvisor stated "…Dont get a first floor room, the door opens to the outside, and there is minimum security."

b. In another TripAdvisor review of that location in August 2016, user "Ivsa Obmore" stated "…the other hotel renters where a lot urban and scary looking. I didn't feel safe. I left the hotel after 3 hours."

c. In March 2010, "TNT_Traveler_10" wrote a Tripadvisor review that stated "…As I approached the group, who I discovered were standing outside my room, I could see that there were two men and one teenage girl. I could hear that they were having a violent argument and the younger of the two men was yelling at the girl for "[--]dudes for money". The older guy was clearly high on drugs and was just standing there. The young guy ran past me and the girl followed."

126. Red Roof was aware of negative reviews of the Red Roof PLUS+ DC-Oxen Hill, including:

---

[64] *See* https://www.wbal.com/article/102663/3/the-game-change-part-iv-a-hub-for-sex-trafficking
[65] *See* https://www.capitalgazette.com/entertainment/cg2-arc-140104gn-trafficking-20140104-story.html

    a. Another reviewer "brenna m" in October 2017 said "Do not stay at this place! walking through the open hallway the smelled of pot , cigarettes was terrible. Sketchy people walking around the building . Not comfortable and not safe. Before you book do your research."

    b. In April 2017, a TripAdvisor user "Joecooool" said "…There was questionable activity outside my room and I did not feel safe coming and going. My door had multiple dents in it."

    c. In October 2016, in a TripAdvisor review "Nunya B" stated "…It's also not situated in the most safest of areas."

    d. In a September 2016 Tripadvisor review, user "Gigi" stated Red Roof Inn PLUS+ Washington DC-Oxon Hill "…The parking lot is creepy with drug smokers and used condoms...Beware"

127.    Red Roof was aware of negative reviews of the Red Roof PLUS+ DC-Alexandria, including:

    a. In a June 2019 TripAdvisor review, "Louis" stated "As a single woman traveling alone, I would never stay here again… in my 2nd night, there were people standing practically outside my door, along the balcony, …. loudly talking, cursing, and drinking till around 2 am. The next evening after coming back to my room, I encountered around 5 men just standing right near by door again, just staring at me as I went into my room, which made me very uncomfortable. That night, there was again just men this time, congregating right near my door, talking loud, drinking until about 1am, then that same night, one of them knocked on my door at 3am, not saying anything at first, but then asking for a light for his cigarette. He would not go away until I threatened to call the police. VERY scary

36

situation, especially since I was there alone. I called the front desk and he said he would come up to see what was going on, but I never saw him. I will never stay at this place again. I feel it is very unsafe."

b. In an October 2016 TripAdvisor review, "PearlG" stated "…I stayed here for business and there was a constant element of shady characters. Be prepared to spend a restless, noise filled night…  Don't bother calling downstairs because you will immediately alienate the front desk…"

c. In a May 2013 TripAdvisor review, "GailM17" said "Horrible and seedy. Would never stay here again. Room smelled. Many long term guests living there. I did not feel safe here. Would have left but after driving all day and was travelling with my dog so no other option."

128.     Upon information and belief, Red Roof monitors customer reviews and complaints for all brand properties.

129.     Upon information and belief, the branded properties depend on Red Roof for notification of negative customer reviews.

130.     Upon information and belief, Red Roof, not the branded properties, house and control the data regarding customer reviews.

**THE DEFENDANTS FACILITATED THE TRAFFICKING OF L.G.**

131.     Red Roof profited from the sex trafficking off Plaintiff L.G.  Red Roof rented rooms to L.G.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where L.G. was trafficked. The hotel staff, especially front desk staff, at Red Roof's properties knew or should have known of the obvious signs of L.G.'s trafficking.

132.    Red Roof benefited from the steady stream of income that L.G.'s traffickers and "johns" bring to their hotel brands. Red Roof profited from each and every room that L.G.'s traffickers and customers rented.

133.    Red Roof has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Red Roof should have been aware of human trafficking occurring at the locations where L.G. was trafficked because of Red Roof's access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

134.    Red Roof repeatedly collected data on L.G., her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Red Roof's employees witnessed the obvious signs of L.G.'s trafficking such signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information, Red Roof failed to take reasonable measures to stop sex trafficking from occurring in their hotels. If Red Roof would have taken proper measures, L.G., and other victims like her, would not have been trafficked at their locations for so long.

135.    Red Roof failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on their properties. Red Roof maintained their deficiencies to maximize profits by:

       a.     Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

       b.     Lowering operating costs and management costs by failing to analyzing the

data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c.    Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.    Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.    Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.    Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.    Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

136.    As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, L.G. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## **CAUSES OF ACTION**

**A.    COUNT ONE – 18 U.S.C §1595 ("TVPRA")**
**(Against all Defendants)**

137.    The Plaintiff L.G. incorporates each foregoing allegation.

138.    L.G. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

139.    Red Roof's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Red Roof had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, Red Roof breached this duty by participating in a venture which facilitated the harboring and providing of L.G. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

140.    Red Roof has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and limiting mandatory regulations. Moreover, Red Roof directly benefited from the trafficking of L.G. on each occasion they received payment for rooms that she was being kept in at Red Roof's branded hotels. The actions, omissions, and/or commissions alleged in this pleading were the "but-for" and proximate cause of L.G.'s injuries and damages.

141.    L.G. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss

of earning capacity; past and future emotional distress; consequential and/orspecial damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

       b.       Disgorgement of profits obtained through unjust enrichment;

       c.       Restitution;

       d.       Statutory and/or treble damages, where available;

       e.       Punitive damages;

       f.       Attorneys' fees and expenses;

       g.       The costs of this action;

       h.       Pre- and post-judgment interest; and

       i.       Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated:  April 9, 2022                                   **RESPECTFULLY SUBMITTED,**

                                        */s/ Steven C. Babin, Jr.*
                                        Steven C. Babin Jr. (0093584)
                                        Jennifer J. El-Kadi (00100660)
                                        **Babin Law, LLC**
                                        22 E. Gay Street, Suite 200
                                        Columbus, OH 43215
                                        T: 614-761-8800
                                        F: 614-706-1775
                                        E: steven.babin@babinlaws.com  /
                                        jennifer.elkadi@babinlaws.com

                                        */s/ Kimberly Lambert Adams*
                                        Kimberly Lambert Adams (*pro hac vice pending*)

Emmie Paulos (*pro hac vice pending*)
Kathryn L. Avila (*pro hac vice pending*)
**LEVIN PAPANTONIO RAFFERTY**
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850.435.7056
F: 850.436.6056
E: kadams@levinlaw.com /
epaulos@levinlaw.com /
kavila@levinlaw.com /

*Attorneys for Plaintiff*